The Illinois Appellate Court for all provisions now in session, the House of Justice, State Guard, and Barrow is adjourned. Good morning, everybody. Please be seated. Madam Clerk, please call the case. Case 1-240371, Doug Harlan, individually as an independent administrator of the estate of Erin Beth Barden v. Northwestern Memorial Hospital et al. All right, good morning, everybody. Just to set the stage here, both sides are going to be allowed 20 minutes for argument. In addition, the appellant is allowed five minutes in rebuttal, so there's no need to reserve time. When you step up, you've been here before, but just remember to state, tell us your name, and then also the microphones do an excellent job of recording. They do less of a job of amplifying, so just keep that in mind. Counsel for the appellant may proceed. Good morning, Justices. May it please the Court. My name is Stephanie Nathanson, and I am here on behalf of the plaintiff appellant. I am here today to hope to correct the error that I believe, the errors I believe, that occurred in the trial court when we went to trial on the Deb Barden case in front of Judge Brajnahan. That case was ready to proceed to trial with experts, prepaid, ready to go on the pleadings. We had a complaint with the correct affidavit of airship and airs, and were set to proceed to trial, and were ready to go. At the time of trial, though all motions to dismiss had been heard, had been denied, motions for summary judgment had been heard and had been denied, discovery was closed, ample opportunity was given by the court to also have defendant further investigate if they had any additional questions about the status of Neha Waddis as a legal spouse. So what was the affidavit of airship that you're saying was filed at the time of trial? So the affidavit of airship that existed at the time of trial is given that we had no evidence of a legal marriage recognized in the United States under Illinois law or any other law of a state, because they also resided at a point in Boston. We had no evidence that they had ever filed to have that marriage recognized. They being? Errandum and Neha. Okay. The two that were at issue here. But at the time of the complaint, complaint one and the second complaint filed, in both of those complaints, Errandum was an unmarried male with no children. Correct? In the sense of the law, Judge, as you know. I don't know. Did the complaint say in the sense of the law? Oh, yes. No, the complaint declared him that way. Correct. Unmarried. Yes. No children.  Okay. Yes. Not unmarried asterisk, but unmarried. Correct. Based on our research and my own client's personal knowledge, who also got married in India, Deb, the brother, who was very intimately involved in his brother's dealings and ceremonies, in order for their marriage, him and his wife's, to be legally recognized in the United States, they had to have that proven, that it was a legal marriage recognized under laws of India, that it was done as a particular religious ceremony, which we cited that statute that Illinois also recognizes. And there's certain requirements to render that marriage legal in the United States. As you saw in Bengali, there was a substantial evidentiary hearing on that marriage to determine if it was legally sufficient. And then you register that marriage, that marriage license, proof that that marriage was legal and recognized in the country of India, and you have that recognized here, and then you're declared and considered married in the United States under U.S. law, specifically in our occurrence, Illinois or Boston law, because they did relocate to Boston, you saw, before his death. I don't want to turn this into the procedures to certify marriage here in the United States, so I don't want to derail your argument.  But proceed otherwise. Okay. And so based on our research, the personal knowledge of our client, that this was never registered here. He knew that from his brother. He knew that from his sister-in-law. He knew they never took the steps to have this registered as a legally required, a legally recognized marriage in the United States. We absolutely and accurately believe that, in my estimation, that the heirs of the estate were considered the surviving parents and the brother, given that he had no marriage recognized, which is a legal status, and I can address judicial admission shortly. But it is a legal status, not a question of fact. I'm sorry, Ms. Nathanson. Yes. You saw the motion in limine number 28, I believe, seeking to bar the defendants from suggesting at trial that the wife was not the heir or that she was not the wife of the deceased. No, I believe that the motion in limine was seeking not to have them argue in front of the jury that she was the wife and that Deb was cutting her out. But when this changed with Judge Brazehan and she declared her the sole heir, yes, then that was my position. When she declared her the sole heir, then I was in a situation where she had never testified in this case. She was barred in the motion court because she was in London. They were never able to get her deposition, so she never testified in this case. But she was barred because she was in London, or was she barred as a discovery sanction? Well, it ended up being a discovery sanction, but our office tried to reach her many times through letters in London of the last known address. I did Alexis Skiptray's personal record search, and we tried to locate her and find her. We sent several letters that were not returned to our office, but when I talked to her on the phone finally at trial to resolve this final issue, she said that she had never received those. So we had never heard back from her. We knew from the beginning of the case she had no interest in pursuing this. She did not want to be part of it. Because of that, I guess I'm a little off on that one. We had no contact with her, but we also knew definitively that she didn't have any interest in it. And I can explain that, Justice. This is not in the record, but I have a relationship to this family through my sister went to Northwestern Law School with Mr. Barden's best friend. They knew the families. And when he was in my office in Chicago trying to pursue this case, he was reaching out to her in front of me. And not in the sense that I'm sitting my ear in the phone, but what I heard on my end of the conversation was that he absolutely wanted her to be part of this. And wanted her to be. He thought the best case scenario, as all of you understand as justices, the better case in Illinois as a plaintiff's lawyer, and the better case for the estate is a spouse. A spouse's loss. And if we could prove they had a legal marriage, which we were still trying to figure out. So I heard him on the phone with her talking about, did you ever register this in Illinois? They did not. And then she had no interest in this and said it would adversely affect her mental health. And that she was so fraught and barely was getting by on mental health counseling. She wanted no part to this case. She was, their families are very close in India. Their parents are very close. So this notion that someone was trying to cut someone out. I also think it's important for the justices to know that this isn't a normal case in the sense of, these are all very successful people with their own things going on. This wasn't a battle for money. This was a. I have no idea how that's relevant to anything that you've said so far today. Okay. And the only reason. So let me interrupt you. Sure. This case pended in the circuit court of Cook County for how many years? I believe this case was initially filed. I'm sorry. I just forgot the caption. Several years. Several being more than two. How long was it in probate? Absolutely. It was in probate since the beginning as well. And how many, that's more than two. We're not sure.  And the argument that was made on several occasions was that the issue of the succession actually of the heirs was to be litigated and reserved actually by the probate court, correct? That was never done until how many years later? You mean when we finally got the disclaimer entered? Yes. Okay. We did get the disclaimer entered because we felt that there was no other choice after Judge Bosnahan declared her the sole and only heir. But there was no other choice. What was the holdup then? There was no, to our understanding, there was no legally recognized marriage in the United States. And as Deb testified in his deposition, they never registered that he had discussions with his brother about how to do that. He said they didn't do that. They chose not to do that. Deb did not know whether the marriage in India was legal. I set forth in my brief the standards you had to meet in order to have a foreign marriage recognized in Illinois particularly under our statute and what you had to prove. You had to prove it was legal in India. You had to prove it was of a certain religion. And the question is why wasn't that done in the probate court, counsel? Why wasn't that done? Yes, prior to the time you got ready for trial. Because as we were proceeding, she was not a legal wife that needed to disclaim. They were not, they never took steps. It was still a pending probate court. That probate case, it was not resolved. It was not resolved and the last orders that Judge Malone had entered was that we would come back after the verdict. And then why didn't you do that? Oh, this is right after the verdict. That was the order Judge Malone entered. The last order Judge Malone entered was that we were to return after the verdict and finalize the heir. So if in order to... At some point it became clear to you that there was a problem. There was a problem because Judge Rajnahan at trial declared Neha Wadis the sole heir of this estate. But you're not going to say that at trial was the first time this question of who is the heir was raised, right? Judge Rajnahan had raised that, let's say, years before. No, she was only our trial judge. Okay. But other judges had raised it years before. Well, they had litigated it. I want to be clear. We were always forthcoming with the circuit court, law division judges, that she was out there. We had disclosed it in Doug Barden's answers to discovery. Because as your honors understand, as justices understand, there are people who before same-sex marriage was legal, participated in wedding ceremonies, had marriages. They considered themselves spouses. But there was a time where that wasn't a legally recognized marriage. And that was fraught at times in our country because what did they do if that person died in testate? That's not a legal spouse. So this is a similar issue. We're not denying, and no one was ever trying to hide, that they participated in a wedding ceremony in India, that they held themselves out as husband and wife. Did you put that into any documents you found in the probate court? Because the affidavit of heirship didn't mention that the wife or presumed wife or supposed wife in any way, did it? Did Malone know that there was? He did know. If you look at all the probate orders, which I know are in the record because they were attached to defendants' briefs on my briefs, you'll see that it keeps getting continued at points to try to locate the heir, the potential heir. Did it mention the wife specifically in those orders? Yeah, that's the only other person we're talking about. The only people at issue here, my associate was fully briefing him on this problem. He fully briefed Judge Malone. Again, he had cardiac issues and had to leave. He had money and medical problems during this. That was in the record. But he absolutely briefed Judge Malone that we believe this wasn't a legal marriage, but we want to make you aware that she is out there. They lived as married. They held themselves out as married. They had a wedding ceremony. He asked us to try to locate her. That's where we got sent the letters in London, and we were not getting a response. So when it was continued in probate to determine heirship, you're saying that was to determine if Nihal Wadis was the proper heir? I don't believe that was ever the true intent, and I understand the records a little bit confusing. It was to make sure that ethically we were apprising both judges that while we believe this was not a legally recognized marriage in the United States, this person called themselves married, resided together, did a ceremony in India, held themselves out as husband and wife. And yet, despite all that, a complaint was filed that Arendam Bartum was an unmarried male. Despite all that. Correct. Because on my investigation, and when I researched the law, and Deb sent me the processes, and I cited the law in my briefs, Justice, that there is a standard for just because someone gets married outside of the country and holds themselves out as married doesn't mean that that's a legally recognized marriage in the United States. I think we all understand there's a difference between the legal status, and marriage is a legal conclusion. It is a legal status. So no one, and that's why Deb was very honest in his discovery and his deposition. He went to their wedding. They had a ceremony. But when they asked Deb, was that a legal ceremony under India law, which you saw under the Marriage Act I cited to you and the Foreign Marriage Act and how you get that recognized in the States, there's a standard you have to meet to have a foreign marriage considered to be legal in the United States. Deb did that with his wife. He knows the process. He had personal knowledge of the process of how he had to go through showing his legal marriage certificate in India, getting registered with the clerk of his court in that state, getting it recognized as a marriage, getting it filed and getting it certified. Then you are legally married in the States. But in order for them to do that, you have to prove the marriage was legal in India. Deb testified under oath in his death. He did not know if the marriage was legal in India. He had no knowledge of that. He also said he knows his brother, and he had personal knowledge because he had talked to him about the processes he took to get his marriage legally recognized, and he wanted to make sure that Arindam did that. And Arindam said, we have not done that. Which, by the way, while it's not on the record, you saw I was forced to talk to her at trial, and she confirmed they never had this legally recognized in the United States. They never took those steps. Okay. So if it's not on the record, then we should be considering it. But to your jurisdictional argument, that you're saying Judge Walsinghan overstepped essentially and decided this error issue when it was in front of the probate court, isn't there a distinction between who are the errors under the probate act and the estate case as opposed to who takes under the wrongful death act? Well, yes, but here's the distinction. The way these are handled when you prosecute these cases in law division is the law division judges determine percentage of dependency. So if I have no will, sure, once you've already determined who the errors are, between the brother and the siblings. Yes. But as to who's a taker under the wrongful death act, isn't that something within Judge Bosnahan's purview as a law division judge trying the wrongful death claim? No, that was solely in the jurisdiction and purview of the probate court. The probate court always enters the affidavits of heirship. The probate court always handles who the errors are. The law division judge deals with if there is a ruling or a verdict or a settlement. Percentages, a lot of times the parties agree and family members agree. I want to get 50 to the mom, you know, the kids get 50. But if he had a wife, the wife is the only taker under the wrongful death act. There wouldn't be a percentage between the brother and the siblings and the wife. There would not if she was a legally recognized wife, correct. What about the fact that the probate judge, when he entered that order on November 8, 2023, specifically crossed off the language about the wrongful death act? There was language in that order, the draft order, that this case shall proceed under the laws of intestacy and the heirs of his wrongful death lawsuit shall be his brother and parents. That was crossed off by the judge's hearing. Yes, because he told me that I don't need to say that again, that that's what it says above. And then I cited the probate act in here that he cited. He said I'm repeating the same thing essentially, that it goes under that statute and the statute, because she would be considered pre-deceased, the only people that would be his heirs, the only other family, he had no children, would be the two parents and the brother. Under the wrongful death act. Yes. That was what Judge Tiernan meant. Yes. Okay. So he said I'm repeating myself, I don't need to list out names, they're already in the prior order of ownership, and that that statute governs, which I also cited in my brief, that statute governs that it would be the next of kin defined as if your spouse is pre-deceased, you didn't have a spouse, and then it's your parents and any surviving siblings with no children, because he had no children. And that's undisputed. But that, I guess, that begs the question, the spouse had to disclaim her interest. Had or had not, I'm sorry. To get to this point, to get to that point in probate, the spouse had to disclaim her interest. And I want to explain that. Because where I stand legally and where we stood legally throughout the case in our investigation of how that marriage would be considered a legal marriage, not a wedding ceremony, but a legal marriage. But it was your responsibility or whoever was the trial lawyer's responsibility to get that determination made by a court. It could not just be your determination of the law. When you had probate matters pending over here, you should have prosecuted that through the probate court, and that would have resolved this. And that, I'm sorry. That would have resolved this prior to getting to the trial, prior to preparing for trial. That would have had this issue resolved. Yes, Your Honor, but what occurred with Judge Malone is we advised Judge Malone on multiple occurrences. You saw we appeared at many statuses. She is raised in orders. She's the only other person we could be talking about. There's no other errors or potential errors. We tried to reach her in London. We advised her of the occurrence that she was out of the country. She's not responding. Dad did not have her number because she was no longer in the country. I tried to research a phone number. And so we tried to do everything we could to confirm it with her. But when I was signing up the client in the beginning of the case, he was... But that's all off the record. What seems to be on the record is, at least at some point during jury selection or in a break, there's almost an immediate contact with... Because then she returned to the United States. She was back in the United States at that point. Okay. So she was back in the United States. She had relocated back to New York. So Dad had to reach out to a family member of a friend. They found we got a phone number for her, a cell phone, because their families, their parents, are very close. So, again, this wasn't people trying to cut an arrow. Whatever that is, parents are close. When it seemed like the rubber needed to meet the road, contact was made very quickly. When she was back in the United States, that was far easier. Correct. And we were able to get in touch with her when she was in the country, and that was during trial. And, by the way, and it's very clear from the trial record, when I'm coming back into Judge Brosnahan reporting the phone calls, she confirmed everything was true, that she told Dad that in the beginning. She didn't want any part of this case. She didn't want to prosecute it. She never wanted to be involved. She didn't want to be hoisted into this as an heir, and she wanted no part of it. But when Judge Brosnahan ruled that she was the sole heir, she felt very badly that the family's case was going to be dismissed and thrown out with prejudice, and she did not want that for a rindom. She wanted justice for a rindom. They wanted to start a foundation for a rindom, so she said, if I have to, this will be very detrimental to my mental health. If I have to, I will come here, and I will do it, and I will take it over, but I don't want the money. It was very much not something she wanted to be part of. And she did confirm to me again, and I said this to Judge Brosnahan in the record, that she did not take any steps to register their marriage and make it a legal union in the United States of America, much less the state of Illinois or the state of Massachusetts. They took no such steps, and Deb had personal knowledge of how you do that, and it wasn't done. He knew that from his brother. He knew that from his sister. In law, as they acted. So in my view – Sorry, go ahead. Who had the burden to establish that it was not a valid marriage? The brother and the siblings who were trying to take, or – I think you made the argument that it was the defendant's obligation to establish that, but whose burden was it? Well, there's actually an order by Judge Gillespie, because as you see in the Water Region Court, the defendants are constantly trying to re-raise this and say that she is the sole heir, and we're raising to him the issues of our London service and the fact that our understanding and our knowledge from the family, and they did go through his things. They found – What does the order say? The order from Judge Gillespie. The 312 of 18 order from Judge Gillespie says he gives defendants a final opportunity to conduct discovery and find out her legal status since they are the one averring and they are the proponent that our heirs and our affidavit of heirship is incorrect and that she is the sole taker, and they said that they needed to see this and decide this before trial. And Judge Gillespie said, okay, I agree, and gave them an extension, and it continued everything. It said, I agree. I'm going to give you a final opportunity. When he had given an opportunity before that, which they can also issue subpoenas. They were the ones questioning our veracity of it not being a legal marriage. Basically, he gave them an opportunity to depose Neha Wattis, right? No. He also said do any discovery. You can issue subpoenas to the state entities where these things are filed to be registered. We knew the two states they resided in were Illinois and Massachusetts because he passed in Massachusetts. That was his last place of residence. And so that was their final opportunity, and he gave them several opportunities before that to do any discovery because he's like, you're averring. You're averring that this is wrong, and this is a legal marriage. I can't just determine that. They want to judge Gillespie to determine that solely based on Deb Martin's testimony that he went to their wedding in India, where Deb also said, I don't know if it was a legal marriage under the laws of India, which would be required for it to be a legal marriage in the United States. And so Deb and Deb went through with Mr. Atwood in deposition how you do that here in the United States because he did that process with his wife and had personal knowledge. So they— Ms. Nance is in the—oh, I'm sorry. Oh, I'm sorry. Go ahead. I don't want to—we're kind of running a little longer on time, so I do want to give you a chance to address what the other part of this— one of the other part of this, which is the survivor claim and what you alleged was the dismissal by Judge Brosnan on that claim. I want you to address that argument. Okay. I feel that was largely set out in our briefs, but as to the Survival Act, I disagree that those witnesses were not disclosed. They were disclosed and deposed. I believe that they're established conscious pain and suffering. My expert also talked about how the arrhythmia and cardiac situation that he endured and occurred in Massachusetts when he fainted and died, how that process— Based upon the testimony of—not the expert, based upon the testimony of the EMT or some person in Massachusetts.  There were two doctors. Yes. Thank you, Justice. Yes. So those—I believe that those were sufficient. They were not only disclosed but deposed. So these weren't surprises. So the witnesses were disclosed and deposed. Okay. But at trial, that doesn't really matter if they were disclosed or deposed. How does the expert—how does Dr. Kahn— It's the same.  How does Dr. Kahn introduce that evidence substantively at trial? Well, as an expert who is versed and knowledgeable in cardiac conditions and cardiac diseases and how your heart stops in these conditions, how an arrhythmia causes your death, how the process of the body shutting down occurs, and what his knowledge and training and experience is of how you would experience that, what your body would go through during that time, he does have the personal knowledge and years, based on knowledge, training, and experience, of what a patient would go through suffering that occurs. But he doesn't have any personal knowledge of what Erin did—went through. You're taking personal knowledge. No. As you know, Justice, he would rely on his knowledge, training, and experience treating like patients with this condition who have fainted and died in his care. And in his long studies as a doctor, literature, all his— So all that. —foundation. So let's go to evidence, our evidence classes. So then the expert can testify to hearsay. And everything that you're talking about, yes, in reaching his opinion. But how does that come in as substantive evidence that Erin suffered this? Well, in medical negligence cases, Justice, there's oftentimes where experts say, based on my knowledge, training, and experience, based on my years of treating this condition, treating similar conditions, with this particular reason that he died at this time, suffering an arrhythmia that his heart could not handle due to the genetic disorder, that this is what your body would experience. And there would be conscious pain and suffering in these occurrences, more likely than not. He doesn't have to say, I was on the street with a rindom, and he told me he was in pain. No, he doesn't have to say that. You're right. To reach his opinion, he doesn't have to. Who was going to say it? Dr. Kahn and the doctors that you've mentioned that treated in Massachusetts. Dr. Curley was going to say that? Yes. At trial? Yes. But he wasn't going to be called at trial. That's what defendants said. Well, who were the witnesses that were going to testify to it at trial? Who was going to testify to that specific condition that you're talking about? Dr. Kahn, Dr. Curley. And as you likely know, Justice, sometimes plaintiffs have a witness list, and if an expert covers something, you may withdraw a witness and decide not to call them in trial to shorten that trial. So Dr. Curley was going to testify to those conditions? Yes, he was deposed, he was disclosed, and he's on the witness list. Deposed and disclosed, I understand that. Was Dr. Curley represented to be a witness that was going to be testifying at trial? Yes, that was discussed, but I also noted that I may call him off or I may not call him at trial if Dr. Kahn was going to cover the subject matter that I deemed sufficient because he was testifying first. So Dr. Kahn was my first witness. If Dr. Curley testified, how are you going to get around the hearsay problem about these eyewitness accounts of what happened? You heard Dr. Curley testify in the medical records? There's a note from I'm not sure who, but that the decedent told eyewitnesses that he felt like he had it before he collapsed. Correct. So you're offering that for the truth of the matter asserted, right? That eyewitnesses saw that he told eyewitnesses he felt lightheaded before he collapsed. I think it would be in light of exceptions to hearsay of... Which one? Well, this was for medical care. This would be a certain... Statement to a treating physician. Yes, but also I would deem that there are several exceptions you could go into. Give me one. I don't need seven, just one. Okay, well, I would say it is a certain kind of utterance that's inherently reliable because you're literally in the process of dropping and fainting and saying to strangers that... But that's a statement. You're saying a statement to the physician. If Curley is testifying, Dr. Curley is testifying, if he was testifying. Okay. How is a statement made by a witness who's not speaking to Dr. Curley? How does that come in? Well, it goes into... It doesn't have to come in for the truth of the matter asserted, but things you could be considered at the scene, things that could be relied upon, and that's where Dr. Kahn comes in, because experts under Wilson v. Clark and other cases can rely upon things that may not be otherwise admissible. We're conflating now what the expert... I think we've established the expert can rely on hearsay in reaching their opinion. Okay. Yes. But now we're at Dr. Curley. You're saying if Kahn testifies to it, Kahn can testify to what Curley found, and what Curley found was this. And so we're going to be able to shoehorn all this hearsay in all through Dr. Kahn. Well, I think that would be part of a paramedics report that is typically and reasonably relied upon by physicians in the treatment of a patient, certainly when they come into the hospital and they're dealing with a death or near-death situation, and they would want to know the history at the scene. They would rely upon the history at the scene in treating him, pronouncing him dead, and trying to figure out what happened. And so, again, I just want to make sure I'm clear on this. Dr. Kahn is going to testify to what Dr. Curley would say was contained in the EMT report, or what the EMT noted. Right, the EMT would note. And Dr. Kahn can rely on the EMT note. Dr. Kahn can rely on that substantively. You're saying that is substantive evidence that can come in at trial. No, it can be a basis of his opinion. Okay, yes, we agree on that. Can it be anything more than a basis for his opinion? I think it could be a basis of his opinion, taken along with his knowledge, training, and experience, that that would be consistent. Yes, but that is the limit of what Dr. Kahn would, what those statements, all those statements, Dr. Curley's, the EMT's, all those, or even whatever witnesses observed Aaron did at the scene, all of that could be the basis by which Dr. Kahn forms his opinion. Correct? Yes. But only that. That I agree with. All right. Well, that I agree with in that setting. But I think my grief set out, you know, my, I'm sorry, I prepared less on the survival act because I thought much more was going to be discussed about the heirs and the next of kin and how the probate proceeded. So, but I do believe that my brief addressed how that evidence would come in. Okay. So maybe it's best that on some of it I stand on that brief. Stand on your brief. I'm sorry.  I thought I had 15 minutes and I was preparing more on the first section. So I, this is my first time doing that. I apologize if I. Not at all. Not at all. Okay. There. Okay. We went a little long. So we'll have a chance to address any of the arguments in rebuttal. Okay. Thank you, Ms. Nathanson. Counsel. Mr. Howey. May it please the court. I'm Scott Howey. I represent the defendants at the Lees in this matter, Northwestern Memorial Hospital, Northwestern Memorial, Northwestern Medical Faculty Foundation, and Dr. Hossain Al-Ridahali. This court should affirm the judgment of the trial court.  Both the dismissal of the wrongful death claims and the summary judgment on the Survival Act claims. First, as to wrongful death, it was not against the manifest weight of the evidence for the trial court to find that the decedent's widow was his sole lawful heir and that his brother and parents therefore had no standing to recover as beneficiaries under the Wrongful Death Act. Nine years, that's nine years, Justice Lyle, after the case was first filed on their behalf. And it was not until two months after the claims had been dismissed that she purported to disclaim an interest in them. So the trial court correctly dismissed the wrongful death claims because the parties named as beneficiaries had no claim to recovery under the Act. Second is that the Survival Act summary judgment was proper because there was no evidence that the decedent experienced conscious pain and suffering that is necessary to prove damages. Taken as a whole, the outcome of the action was procedurally proper and should be affirmed. Mr. Howie, can I ask you, right off the bat, you start with that the Wrongful Death Act ruling was not against the manifest weight of the evidence. So that's the standard you believe we should be applying? Well, the standard for the dismissal is de novo. The standard for the finding that Neal Wattis was the lawful spouse and therefore the lawful heir is manifest weight. Okay. And the burden, as Justice Krish alluded to, is not on the defense to disprove the plaintiff's case. It is that the burden is on the claimed beneficiaries to prove their entitlement to recovery under the Act. What about Judge Gillespie's order from March 12, 2018 that Ms. Nathanson referred to where her position is that Judge Gillespie put that burden on the defendants to sort out? Judge Gillespie authorized discovery into the issue. I think that is different from suggesting that he placed the burden on the defense. And in any event, if that were his intention, it would have been an error. What the judge did was authorize discovery, and what the defendants did in response to that was issue requests to admit, specifically a request to admit that the decedent, Aaron de Bardem, was in fact married at the time of his death. That request to admit went unanswered and therefore by operation of the rule is deemed admitted. In addition to that, there were answers to interrogatories answered by the plaintiff and the administrator, Deb Bardem, the brother, who acknowledged that the decedent was married both on the date of the alleged negligence and on the date of his death. And those are all consistent. And again, the brother also made the same admission during his deposition testimony. And so those are all evidence of a marriage, at least in a general sense, raising the issue and creating a question as to whether there actually is a valid interest by the claimed beneficiaries, if they really are in fact the heirs. The evidence that he was in fact married at the time of his death is sufficient for the trial court to make that determination. And in fact, the trial court has the primary role in making that determination with respect to who takes under the Wrongful Death Act. It's not the probate court in this instance. And we know that from this court's decision in Bengali. Bengali is a prime example of a case where the trial court made that determination which was in fact in conflict with an order of heirship issued by the probate court. Bengali, in Bengali, this court recognized that that is a decision for the trial court to make. And an order of heirship from the probate court is at best a factor. It creates a presumption, as Bengali put it, of a marriage or of heirship, I'm sorry, with respect to wrongful death. But it's a rebuttable presumption. And in fact, in Bengali, that presumption was in fact rebutted. And this court affirmed the court's determination that despite what the probate court had held in a general sense with respect to the Wrongful Death Act and the wrongful death claims in Bengali, the persons who were claiming to be heirs in that case, just as in this one, the parents and the siblings, were not in fact the lawful heirs because the decedent was married at the time of his death. And that case did turn very pivotally on the legality and the validity of the marriage. But it was not a pivot that turned upon whether the marriage had been registered in the United States. That issue is completely absent from Bengali. What Bengali was concerned with was the question of whether the marriage was valid in the place where it was performed, in the nation of Mali. And much of the opinion is given over to the discussion of Malian law and the conflicting evidence and the expert opinions and the various experts who spoke about these issues in great depth and gave the trial court all the evidence that it needed to make a determination, contrary to what the probate court had found, that the heirs were the heir was the person who had been married to the decedent at the time of her death in that case. The council has made an issue, tried to make an issue today and in the briefs, about the failure of these parties, of the decedent and his wife, to register their marriage, to make it legal in the United States, but hasn't pointed to any requirement under Illinois law, under municipal law, under United States statutes, any suggestion that the marriage needed to be registered in any sense before it could be validly recognized for purposes of the Wrongful Death Act. Hasn't made that argument in this court. Didn't make that argument in the trial court. And so what the trial court had before it was a person who had a spouse, believed himself and she believed herself to be married to each other at the time of his death. A vague suggestion that the marriage hadn't been registered in some sense. I think based on what we have from the briefs and the arguments and the record, there isn't even any suggestion about where the marriage was to be registered, what it means to register it, what agency might be involved, what's involved in doing that. The opinion in Bengali speaks to a broader concept, a determination that the trial court can make under the manifest weight standard as to whether the parties are married and whether there is a legal spouse at the time of the decedent's death such that that spouse is the person who is legally entitled to recover. In this case, the trial judge made that determination, as the trial judge is not just permitted to do but required to do. Within the context of a motion in limine, though? That's one of Ms. Nathanson's arguments, that the procedural posture of how this came to be was inappropriate. Do you want to comment on that part? It culminated with a motion in limine. Motion in limine 28, you're correct, a motion oddly suggesting that the defense should be prevented from doing the very thing that it didn't intend to do at all. But the issue had been percolating since very early in the case. This case had been in litigation, in pretrial litigation, for nine years, even if you count from the time that it was refiled after being voluntarily dismissed. It was still a 40-year-old case. And the issue, the fact that the decedent had been married, or the defendant's contention that the decedent had been married and that the person he was married to was therefore the proper taker, proper beneficiary, and not the persons who claimed to be, had been an issue for years at that point, literally, with several attempts by the defense to resolve that issue, to understand what the evidence was, and to understand the very basic and fundamental question of who it was, whose damages were going to be at issue if the case went to trial. And despite the best efforts of the defense over all this long period of time, we still went to trial, were assigned out to trial, had a trial judge, and were in motions in limine when the issue was still not resolved. So the issue didn't arise then. You were in jury selection. We had jury selection and, in fact, picked a jury, and that issue had still not been resolved. And that is the point where the trial judge made that determination that there is not a person here, the case is not brought on the behalf of a person who is a proper beneficiary under the Wrongful Death Act, and had no choice at that point but to dismiss, recognizing that it was, frankly, unthinkable that the case might go to trial, might be put before a jury, without knowing, without the parties knowing, whose damages were going to be considered. So Justice Squish's question is, at that point then, the motion in limine, which would you agree normally that would be a ruling on, our review of that would be a ruling on, for Justice Judge Bosnian's abuse of discretion on a motion in limine, it becomes, in essence, a summary judgment motion or a motion, a dismissal? So then it becomes a different standard? It's, well, we maintain it's a de novo standard for the dismissal. The vehicle by which it arrived at that ruling I recognize is a bit convoluted, and I think that's by nature of the fact that this is an unusual issue to still be determining at the point of trial, at the point where a jury, certainly after a jury, has been picked. But we don't take issue with a de novo standard. That's, I think, I believe that's reflected in Bengali, for one thing. And Bengali really is on all fours with this case, with respect to the individuals who were claiming to be beneficiaries in that case, just as in that case it was the parents and siblings of the deceased party there. And Bengali stands for the proposition that it's the role of the trial court to make that determination, that it's a manifest way of the evidence standard for making the determination of heirship, and that when the wrong parties are before the court. And in that case, one distinction is that the case was actually tried in that case, because the issue had only arisen two weeks before trial when the defendants first became aware of the existence of the surviving spouse. And so all of the issues in Bengali arose just before trial. The trial court went ahead and held the trial with what proved to be the wrong beneficiaries. Bengali certainly doesn't stand for the proposition that that is the way to proceed, that that is a sound trial practice that ought to be endorsed by a reviewing court. It had to happen that way because of the fact that the issue arose at the 11th hour. But in this case, it arose in the ninth year prior to trial, plenty of time in which that issue could be decided, to be resolved, either in the probate court or in the trial court. And the fact that it hadn't been was no reason for the trial court to proceed to trial with what it at that point knew were the wrong beneficiaries and result in a verdict that would have to be reversed and most likely not proceed to a new trial even at that point. The law doesn't require the doing of an unnecessary act, as several cases hold. And it simply at that point would have been going through the motions. The trial court gave this matter due consideration under the law that it required. It considered the evidence. It considered the many conflicting positions that had been made to it before the court, many of which Your Honors have recognized this morning. And it concluded that a trial at that point was simply not possible. And that is why it dismissed the plaintiff's wrongful death claims brought on behalf of the wrong beneficiaries. With respect to the Survival Act, the plaintiff has made an issue of the fact, has raised at some length, has spoken of the testimony of a witness, Dr. Curley, Dr. David Curley, who by the point of trial, it had been determined, was not going to testify. He was not able to testify in person due to a schedule conflict. The plaintiff had decided not to call him at trial. It's important to recognize that Dr. Curley's testimony was the sole basis that a motion for summary judgment on this very issue had been denied some years earlier. The judge who denied that summary judgment motion did so because he found a question of fact based on Dr. Curley's testimony regarding the possibility of pain and suffering consciously. We maintain, of course, that that was a mistaken ruling and that the testimony that Dr. Curley gave in his deposition was not sufficient to survive summary judgment and it wouldn't have been sufficient at trial. Why is that? Because all he would have been testifying to was the possibility, the speculative chance, that some patients in this condition are known to suffer conscious pain and suffering. What about the fact that within the notes, within Dr. Curley's notes, were notes that either the EMT or that witnesses had observed some, made observations of, errandom? First, those notes are buried under several layers of hearsay. Okay. It's the doctor reading medical records, one level, medical records that in turn depended on what the EMTs had said, second level, EMTs speaking of what eyewitnesses had told them. So at least three levels of hearsay there that would have prevented the admission in the first place. Aside from the hearsay problem, the testimony that still would have been only of consciousness, but without a nexus or an intersection with any pain and suffering. Even the plaintiff only describes this as lightheadedness, queasiness. These are not the sources of discomfort, certainly, but not the sort of pain and suffering that would be appropriate to put before a jury in a survival act claim. Was Dr. Kahn going to testify to that? That's part of Ms. Nathanson's argument, that he was going to testify based on his experience and his opinion of treating patients with similar issues, that there would be conscious pain and suffering. And again, that would be the same problem of presenting only evidence of an opinion that this is a possible thing. It is only speculative, and it can't be boiled down to the specifics of this particular individual, whether he actually suffered the possible. But let's just go with that, Mr. Howey. I don't want to get into what could have, but if Kahn was going to testify to this is, in his opinion, what individuals suffer, can suffer in those individuals. All right, so you have some evidence of that that could go to the trier of fact, and some other evidence through Curley, through Dr. Curley, that there was consciousness at some point? Well, Curley's evidence is, again, is three levels of hearsay removed from anyone who could even say anything about what happened. And the only thing that they could say was an expression of lightheadedness. And that wouldn't be, let's put aside the hearsay, which is clear. Let's say there's clear hearsay issues. Put those aside for the moment. And would those be enough, the consciousness plus Dr. Kahn's testimony, to establish some question of fact that could go to the jury? It would not. Not without something that could be equated to pain and suffering as opposed to lightheadedness. Okay. I'd be happy to address any other questions that the Court might have about this or the wrongful death issue, but I would simply ask the Court to affirm the judgment below. Thank you, Counsel. Thank you. I found the section of my brief that discusses how this would be a legal marriage in the United States, and it's on page 26 of my brief. And it said because they were married in India, the applicable sections of the Illinois Marriage Act, which was also cited in Bengali, would apply. And it talks about all marriages contracted outside the state that were valid at the time, they have to be contracted in the donocile and valid in that place. And under Bengali, which defense relies on but is actually a case that's very helpful to my position here, they had to make a finding in the foreign marriage whether the only way the foreign marriage in India would be validated, and this is page 26 of my brief, is if it was valid at the time of the ceremony under Indian law. Deb did not know. Hold on one second. That's not what the statute says, though. Is it? It says all marriages contracted outside of the state that were valid at the time of the contract are valid in the state, except for contract and public policy of the state. But they had to be valid where they were done, in India. So they had to be valid under the laws of the state of India. And if you look at Bengali, they were looking at that other country's law. They had to hold an evidentiary hearing to find was this marriage lawfully under the laws of India. Was it done? There's only certain religious ceremonies in India that are recognized as an actual and true marriage under Indian law. Was it registered with Indian authorities with a certificate? So there is a standard. Is there any evidence that it was not valid in India? Where's the evidence that this was not a valid marriage in India? Deb did not believe it was, did not know anything that made it legal in India. He did not. So it's just based on his testimony. Yes, because we had no. . . His testimony in discovery was that he did not believe it was a valid marriage. He didn't say it that way, so I want to be up front with the court. He said he did not know, but that he had questions about it because he knows that there were standards under Illinois, I mean under the U.S., and under Indian law, and he doesn't know whether they followed them. And he also talked about how in order to recognize it here, you had to use a certain religious ceremony. You have to use a certain, you have to go through the requirements of Indian law. So if you look at Bengali, the court had to conduct an evidentiary hearing on those matters. The point is Judge Brazahan did not do so to find that this was a legally valid marriage. Legal and ceremony are two different things. So this, we, in Bengali they say you cannot make this determination without an evidentiary hearing that the foreign marriage was legal and recognized in that foreign country, performed by the correct religious ceremonies with proof that it was legally recognized in India to be recognized here. And there was no evidentiary hearing conducted. Judge Brazahan just did it and took the word of the fact that Deb Barton testified that he attended their marriage ceremony in India. So there were nine years. There was nine years to get this hearing held. You were in front of at least three or four different judges in that time. But the way Judge Malone left it, Justice, in probate was that at the end we were going to resolve this and give her notice. I think what's being missed here is that the whole point of this case to them was a charitable endeavor for his justice. I suggest that there's nothing that's been missed here, really. I didn't mean any disrespect. I mean that with the nine years, I do regret, Justice, that I had a sick associate that I clearly didn't realize was struggling. But what I see here is we did not believe, and in good faith, Your Honor, we did not believe that this was a legally recognized marriage. We had no evidence that this was a legally recognized marriage in the United States or in India. And so to call her a wife by law in affidavits, Deb did not believe that to be the case. So in good faith and in that reliance, we did not believe she was a wife. Once she was declared by Judge Razahan the sole heir without any evidentiary hearing of the legality of that marriage, she didn't even determine if that marriage in India was legal and determined that she was the legal wife. And she admitted, if you see, yes, I couldn't agree with plaintiff's counsel more that the heirship issue doesn't come before this court properly and that there should be an appropriate hearing with evidence and notice. Record 59 at 7 colon 12 through 19. So Bengali did exactly what I was asking to do. Bengali said this issue came up before they tried the case, before they picked a jury. And in Bengali they said, you let the case go forward. This other alleged spouse from an outside country had come into the knowledge of defendants. They said we're letting this trial go forward on the parents and the sibling. The trial went forward. A verdict was had. They said this person never took any action to intervene in this case. This spouse never took any action to participate. This spouse never has intervened. We're moving forward. The trial went forward. Then in post-trial in Bengali, they said, okay, we're going to have this evidentiary hearing and see if this country's law and this marriage was legal. So that person met their burden of proof, the move-in, met their burden of proof, the alleged spouse, to show, yes, we were in fact legally married. The court then dismissed the case. Ms. Nicholson, in the pre-trial motions, in front of the motions judges, as Mr. Howey has represented, there were requests to deem admitted that Arrington was married to Neha Wattis. It's not a judicial admission that can be made as a question of fact because you attended a wedding ceremony. So it is not a judicial admission. It is a legal conclusion, and an evidentiary hearing has to occur to see if that marriage was legal, and Bengali sets this out, and that case is very helpful. But you didn't object to the request to admit, or seek to strike them, or even seek to vacate the order deeming them admitted, right? Correct, because, again, this dealt with my associate, and yes, correct, but I did not think that they were binding as a judicial admission because a question of marriage, as I've set forth in my briefs, is not a question of fact and opinion. Deb Arden attending a ceremony does not mean they're legally married. So that was not a legal conclusion that could be made in a judicial admission or in a request to admit. Because request to admit are requests to admit facts. As we know, 216 is under request for admission of facts. It is not a request for admission of legal conclusion. That is what justices and judges do. When people present the cases to them. Understood, Your Honor. And so in this case, if Judge Brosnahan wanted to declare Neha Wadis the sole heir under Bengali, she had to conduct an evidentiary hearing to find that this marriage was legal and was legally recognized in India, which was not done. I set that out in my brief, and that has been recognized in Illinois about a foreign marriage. I do not believe that that marriage would have been legally recognized. And once I was in the position that she was declared the sole heir, I then had to pivot and get her disclaimer. But I believe, justices, that the disclaimer proves what Deb was saying all along. That she wanted no part of this. She didn't want to be an heir. She didn't want to participate in this case. She didn't want to be here. And Bengali talks about substantial injustice. Even though all of this happened and that husband was cut out and the trial went forward, the parents and the sibling, Bengali said it was a substantial injustice to take this case away and that they remanded to try the case under the correct heirs. And it's a substantial injustice to the estate of Arindam Barden and his family to have this case gone on this procedural ground. And, again, motions to dismiss under 2619, as Justice Pritchett raised, are not appropriate in a motion to eliminate at trial. And Judge Gillespie was very clear. She was dismissing under a 2619 that had been denied. Complaints had been answered. Semi-judgment had been denied. And Judge Gillespie ultimately asked the ñ they asked him to determine that Nihawatus, who's another law division judge, was the sole heir. And we went to the probate court about that. The probate court entered an order after Judge Gillespie's inquiry and said, I am the sole determiner, Judge Malone, of the heirship issue. And then Judge Gillespie deferred and said, that's out of our jurisdiction. That's the probate. Ms. Nathanson, one question for you on the Survival Act. I'm sorry. I'm so sorry. It's fine. The defendant's brief points out that the medical records on which you're relying for the evidence of the conscious pain and suffering are not in the record. Are they in the record? I'm sorry. Frankly, I did not re-review that for today. I can give you a letter on that or whatever you would deem appropriate. No, that's fine. Thank you. Okay. Thank you, Ms. Nathanson. Thank you. All right. We'll take the matter under advisement and issue an opinion in due course.